UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTINE M. JONES, individually and as SPECIAL ADMINISTRATOR OF THE ESTATE OF TIMOTHY JONES,<br>    Plaintiff,<br><br>    v.<br><br>UNION PACIFIC RAILROAD COMPANY and STEVEN PIGNATO,<br>    Defendants. | Case No. 12 C 771<br><br>District Judge Joan H. Lefkow<br><br>Magistrate Judge Geraldine Soat Brown |

### MEMORANDUM OPINION AND ORDER

Geraldine Soat Brown, United States Magistrate Judge

Timothy Jones was killed on the morning of August 4, 2010, when his car collided with a train owned by Union Pacific Railroad Company ("Union Pacific") and operated at the time of the accident by engineer Steven Pignato. (Defs.' Ans.) [Dkt 11.] Mr. Jones's widow, Christine Jones, sues on behalf of herself and as special administrator of her late husband's estate. (*Id.*) Before the court is Jones's motion to bar a video purportedly downloaded from a video recording system on the locomotive involved in the collision. (Pl.'s Mot.) [Dkt 63.] Jones filed a memorandum in support of her motion [dkt 70], Union Pacific filed an opposition to the motion [dkt 72], and Jones filed a reply [dkt 76]. The motion is within the scope of the District Judge's referral to this court. [Dkt 60.] For the reasons below, the motion is denied.

1

**Background**

In her complaint, Jones alleges, among other things, that her husband's collision occurred because Union Pacific negligently failed to maintain its railroad warning system and crossing gates. (Compl. ¶¶ 37-38.) [Dkt 4.] Union Pacific denies any fault on its part, contending that the warning lights were flashing and the crossing gates were down at the time of the collision. (Defs.' Ans. ¶¶ 37-38.) Union Pacific has produced the video in question as a representation of the crossing on the day of incident. (Defs.' Opp'n at 1.)[1] The video shows the lights activated and gates down but does not show Mr. Jones's car or the collision itself, although there is a sound of a crash near the end of the video. Union Pacific says that the car and collision are not visible because the camera "records events taking place well ahead of the train" rather than "immediately in front of the train." (*Id.* at 16.) Engineer Pignato asserts that the video accurately reflects his memory of the incident and that the loud noise near the end of the video is the sound of the collision. (*Id.*, Ex. 1, Aff. Steven Pignato at ¶¶ 10(f)-10(g), 11.)

After Union Pacific produced the video, Jones suspected that the video had been altered. Central to Jones's suspicion is her contention that "one should conclude that the subject vehicle must have appeared sometime in the train's camera prior to the collision and that the image was captured on the Hard Drive . . . ." (Pl.'s Mem. at 11.) Jones moved to compel production of "the original electronic video data from the subject train's hard drive." (Pl.'s Mem. Supp. Mot. Compel at 1.) [Dkt 30.] Union Pacific opposed Jones's request, explaining that the video data captured by its system is preserved in the form of the file it had already produced. (Defs.' Opp'n Pl.'s Mot. Compel

---

[1] A copy of the subject video was provided to the court.

at 4.) [Dkt 42.] The hard drives themselves, Union Pacific added, are overwritten continuously with new data. (*Id.* at 5.) Moreover, because the hard drives are removable and interchangeable, Union Pacific could not determine whether this particular drive had been replaced during routine maintenance. (*Id.*, Ex. 8, Defs.' Am. Resp. Fifth Request for Prod., No. 7.) This court denied the motion to compel production of the hard drive, concluding that "the hard drive itself cannot, in fact, be produced because Union Pacific cannot locate the particular hard drive that recorded the video at issue." (Order, June 25, 2013, at 3.) [Dkt 57.]

Jones now moves to bar the video as inadmissible, arguing that she cannot test the video's authenticity without the original hard drive. (Pl.'s Mem. at 1.) Jones challenges the video's admissibility on two grounds: (1) that it is not an admissible "original" or "duplicate" under Fed. R. Evid. 1001, 1002, and 1003; and (2) that it cannot be properly authenticated under Fed. R. Evid. 901(a). (*Id.* at 4-20.) She also contends that the video should be barred as a discovery sanction under Fed. R. Civ. P. 37(c) because Union Pacific failed to preserve the hard drive. (*Id.* at 20-23.)

**Discussion**

**I.     Admissibility under Fed. R. Evid. 1001, 1002, 1003**, **and 1004.**

Jones's primary argument is that the hard drive is the "original" required by the best evidence rule: "An original writing, recording, or photograph is required in order to prove its content unless

these rules or a federal statute provides otherwise." Fed. R. Evid. 1002.[2] The rules define an "original" as follows:

> An "original" of a writing or recording means the writing or recording itself or any counterpart intended to have the same effect by the person who executed or issued it. For electronically stored information, "original" means any printout– or other output readable by sight – if it accurately reflects the information. An original of a photograph includes the negative or a print from it.

Fed. R. Evid. 1001(d).

A "duplicate" is "a counterpart produced by a mechanical, photographic, chemical, electronic, or other equivalent process or technique that accurately reproduces the original." Fed. R. Evid. 1001(e). "A duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." Fed. R. Evid. 1003.

There is a question about whether the best evidence rule applies to the video. Union Pacific argues that it does not and contends that the only question in admitting video evidence is whether the video is relevant and properly authenticated. (Defs.' Resp. at 3-4.) The best evidence rule, Union Pacific argues, does not apply when a witness adopts video evidence as part of his testimony by identifying it, as Pignato has here, "as a correct representation of events which he saw or of a scene with which he is familiar." *See* Fed. R. Evid. 1002 advisory comm. n. (1972); *see also United States v. Bennett*, 363 F.3d 947, 953 (9th Cir. 2004) (best evidence rule is not applicable to witness's identification of a video as correct representation of scene, but is applicable to witness's description

---

[2] Prior to the 2011 restyling of the Federal Rules of Evidence, video recordings were expressly included in the definition of "photograph" along with X-ray films and motion pictures. *See* Fed. R. Evid. 1001(c) advisory comm. n. (1972). Currently, "photograph" means "a photographic image or its equivalent stored in any form." Fed. R. Evid. 1001(c).

of content of GPS device where device itself and its output are not put into evidence); *Snyder v. Tiller*, No. 3:08-CV-00470 JD, 2010 WL 3522580 at *5-6 (N.D. Ind. Aug. 30, 2010) (admitting video as adopted by witness's testimony). Pignato avers that the video accurately reflects the scene of the railroad crossing at the time of the accident. (Pignato Aff. at ¶ 11.)

The advisory committee notes to Evidence Rule 1002 distinguish between a situation in which a witness like Pignato illustrates his testimony by way of a video depicting the scene and a "situation in which the picture is offered as having independent probative value, e.g., automatic photograph of bank robber." Fed. R. Evid. 1002 advisory comm. n. (1972). It appears that Union Pacific may seek to introduce the video for the latter purpose, that is, as independent evidence that the gates were down and signals were working.

Assuming, *arguendo,* that the best evidence rule applies in this situation, the video, which is a readable output of the electronically stored information on the hard drive, is an original as long as it accurately reflects the information. Fed. R. Evid. 1001(d). Alternatively, even if the video were considered a duplicate of the information in the hard drive, it is admissible under Rule 1003 unless there is a genuine question about its authenticity. Jones insists that access to the missing hard drive is necessary to determine whether the video accurately reflects the information captured by the train's camera. (Pl.'s Mem. at 3.) Courts, however, have recognized other methods of establishing the accuracy of recorded evidence, including eyewitness testimony and evidence of the chain of custody. *United States v. Emerson*, 501 F.3d 804, 813-14 (7th Cir. 2007) (discussing audiotape's accuracy); *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001). The Seventh Circuit has "'eschewed any formalistic approach to the admission of tape recordings or copies thereof.'" *Smith,* 242 F.3d at 741 (quoting *Stringel v. Methodist Hosp. of Indiana*, 89 F.3d 415, 420 (7th Cir. 1996)).

5

Here, as described below, Union Pacific has submitted both eyewitness testimony and chain-of-custody evidence in defense of the video, but Jones argues that none of this evidence is sufficient to allow the video's admission. (Pl.'s Mem. at 6-8, 13-20; Defs.' Resp. at 5-11.) Although Jones frames this argument in terms of the best evidence rule, she is raising questions of authenticity, which are determined under Fed. R. Evid 901(a). *See Smith*, 242 F.3d at 741.

## II. Authenticity under Fed. R. Evid. 901(a)

To show the authenticity of an item of evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). The analysis is not formalistic and permits authentication in multiple ways. *See* Fed. R. Evid. 901(b) (listing examples of evidence satisfying authentication requirement); *Smith*, 242 F.3d at 741-42 (discussing authentication of audiotape). Once the proponent of an item of evidence has laid a proper foundation for its admission, the burden shifts to the opponent to rebut this foundation by showing that the evidence is not authentic. *Smith*, 242 F.3d at 742.[3]

### A. Eyewitness testimony

Union Pacific first contends that Pignato's testimony authenticates the video. (Defs.' Resp. at 5.) Pignato states that the camera that recorded the video – the "TIR," Track Image Recording – was situated in front of him and slightly to the left on the dashboard of the locomotive. The

---

[3] In a criminal case, the government must establish a recording's authenticity "by clear and convincing evidence." *Smith*, 242 F.3d at 741. The Seventh Circuit has "assumed, but not decided, that the proponent in a civil case for admission of a tape bears the same burden." *Id.* It is unnecessary to resolve this issue for purposes of deciding this motion.

recording shows the crossing as he approached it, clear of pedestrians and vehicles, with gates down and lights flashing. (Pignato Aff. ¶¶ 6, 10.) Jones responds by trying to cast doubt on Pignato's credibility and on his version of events. (Pl.'s Mem. at 6.) For example, Jones says that "Pignato's credibility is highly questionable" because he lied in his deposition about graduating high school. (Pl.'s Reply at 3.) She also claims that Pignato has contradicted himself by saying that he did not notice the car until "a second or less" before impact even though he saw the crossing approaching for "20 to 30 seconds." (Pl.'s Mem. at 6, citing Ex. G, Dep. of Steven Pignato at 61, 69.) She argues that his testimony is further undermined by that of three bystanders, all of whom say that the car was in the crossing for several seconds before the collision, and one of whom maintains that the gates did not come completely down. (*Id.* at 7-8.) Jones also contends that the car should be visible in the video because Pignato and the bystanders say that it flipped upward after impact. (*Id.* at 7.)

Although Jones's arguments on this point might help her undermine the weight of Pignato's testimony, they do not bar the video's admission. The authentication requirement is satisfied when a witness with knowledge testifies "that an item is what it is claimed to be." Fed. R. Evid. 901(b)(1). Unlike the plaintiff in *Griffin v. Bell*, 694 F.3d 817, 826-27 (7th Cir. 2012), Pignato is such a witness with knowledge, because is able to testify about how the video was made. Jones herself concedes that he was "[t]he only witness with the almost identical vantage point as the subject train's camera." (Pl.'s Mem. at 6.) Moreover, as Union Pacific points out, Pignato's account is bolstered by deposition testimony from bystander Signe Hovde, who agrees that the crossing gates were down at the time of the accident. (*Id.*, Ex. 10, Dep. Signe Hovde at 19-20.)

Jones is entitled to dispute the weight to be assigned to the video. *See* Fed. R. Evid. 104(a), (e) (court must decide any preliminary question about whether evidence is admissible, but a party

7

may introduce evidence that is relevant to the weight or credibility of other evidence.) Pignato's affidavit confirming the video's accuracy is, however, enough to warrant the denial of Jones's motion in limine to bar the video. *See Asociacion De Periodistas De Puerto Rico v. Mueller*, 680 F.3d 70, 80 (1st Cir. 2012) (challenge to authenticity of clips from news show failed where FBI agent testified that media footage of incident accurately reflected what occurred and plaintiffs offered no reason to suspect fraud); *Lang v. City of Round Lake Park*, 87 F. Supp. 2d 836, 841 n. 4 (N.D. Ill. 2000) (denying motion to strike video made by camera mounted on police car because defendant's affidavit established foundation).

### B. Chain of custody

Union Pacific's evidence of how the video was downloaded and preserved further supports its admission. Union Pacific summarizes its process for securing video footage from train cameras as involving six steps: (1) a request is made for a video download, (2) an electrician downloads a "digitally encrypted and watermarked video to CD," (3) the maintenance-shop foreman puts this CD in a sealed envelope and signs it, (4) the envelope is delivered to and signed by the maintenance director, (5) the envelope is retrieved and signed by a claims-department employee, and (6) that employee gives the envelope to the assigned claims representative. (Defs.' Resp. at 7-8.) Union Pacific maintains that this process was followed here and backs up its assertion with citations to deposition testimony from the employees involved. (*Id.* at 8-9.)

According to Union Pacific's witnesses, the system includes a "chained fingerprint watermarking to prevent any modification of the original video data recorded by the DVR." (*Id.* at 17.) The watermark appears as a green check mark on the bottom corner of the video frame. (*Id.*)

If one attempted to modify the video data in any way, the watermark would turn into a red "X." (*Id*.) Union Pacific's witnesses testified that process was followed here. (Defs.' Resp., Ex. 13, Dep. of Joseph Donnan at 17-20.)

Jones argues that, although these steps may generally have been followed, potential discrepancies call the video's authenticity into question. In particular, she targets the credibility of two Union Pacific employees: electrician Aurelio Baez, who says that he downloaded the video, and claims director John Gabel, who admits that he showed a copy of the video to outside investigators before the claims department received the official version. (Pl.'s Reply at 9-12.) Jones contends that both employees submitted improper affidavits containing statements that conflict with their earlier deposition testimony. *See Velez v. City of Chicago*, 442 F.3d 1043, 1049 (7th Cir. 2006) (affirming exclusion of affidavit statements conflicting with deposition testimony). Without these affidavits, Jones argues, the chain of custody is fatally impaired because it is unclear who downloaded the video or how Mr. Gabel obtained an extra copy of it. Union Pacific, on the other hand, argues that the purported discrepancies Jones points out are explained by the witnesses in their depositions. (Defs.' Resp. at 9-10.)

It is not necessary to resolve the purported discrepancies because they do not cast a serious doubt on the video in light of totality of evidence before the court on the motion. "The chain of custody need not be perfect." *United States v. Prieto*, 549 F.3d 513, 524-25 (7th Cir. 2008). "Merely raising the possibility of tampering is not sufficient to render evidence inadmissible; the *possibility* of a break in the chain of custody of evidence goes to the weight of the evidence, not its admissibility." *United States v. Kelly*, 14 F.3d 1169, 1175 (7th Cir. 1994) (emphasis in original); *see United States v. Collins*, 715 F.3d 1032, 1036 (7th Cir. 2013); *Smith*, 242 F.3d at 742.

Jones's other attacks on the chain of custody fare no better. She observes that the spot on the chain-of-custody form for the name of a witness to the video recovery is blank, and that Mark Layton, the maintenance-shop foreman, could not tell from the envelope when the video was downloaded or what it contained. (Pl.'s Mem. at 15-16, citing Layton Dep.) Further, she notes that the next person in the chain of custody, maintenance director Rick Laue, could not remember when and where he picked up the envelope or who he gave it to in the claims department. (*Id.* at 16-17.) Mr. Laue also mistakenly dated the chain-of-custody form a month and a day before the accident occurred. (*Id.* at 16.) These alleged problems do not bar the video's admission, however, because they support nothing more than the possibility of a break in the chain, not a serious question of tampering.

Finally, this court has viewed the video. There is nothing about the video that appears to be suspicious, such as a break in the sequence. It bears a time/date marker that also appears to be continuous from several minutes before and up to the sound of the crash, as well as the "check mark" described by Union Pacific's witness as a guard against tampering.

### C.  Other evidence

Although Jones points to witnesses' testimony that it is *possible* to program the TIR with a different date and time (Pl.'s Mem. at 4-5), the only argument that she raises to suggest that the subject video was actually altered is that the video does not show what she believes it should show. She believes it should show Mr. Jones' car on the track some point ahead of the train, should show the gate is not completely down, and should show Mr. Jones' car being flipped up in the air after the collision. (Pl.'s Mem. at 6-7.)

10

Jones claims that the video is contrary to the bystanders' testimony, but, as described above, the bystanders' testimony does not consistently support Jones' version of the event in such a way as to support a conclusion that the video is not authentic. While one witness says the gate was not completely down when Mr. Jones drove on to the crossing, another says that it was down and that Mr Jones drove around it. (*Id*.). Notably, Jones does not contend that any of the bystanders testified that the video was not accurate. There is no indication in the record that the bystanders were shown the video.

Jones points to three other videos that, in her view, show that Mr. Jones's car "must have appeared sometime in the train's camera prior to the collision and that image was captured on the Hard Drive that has now been destroyed." (Pl.'s Mem. at 11.) The first video was purportedly recorded from the back of the train. According to Jones, if this "back video" were not "almost unviewable"—which Union Pacific says is the result of the video being a "bad copy"—the video would show that the gates were up. (*Id.* at 10.) The second video is of a different collision at the same intersection in which the vehicle can allegedly be seen before impact, even though the "video was taken at night in a blizzard." (*Id.* at 10-11.) Third, Jones cites news coverage of a video that Metra publically released showing the final moments before a train collided with a pedestrian in a different incident. (*Id.* at 11.)

Jones's arguments are merely speculation. Those videos do not show that the camera on the locomotive that hit Mr. Jones "must have" recorded his vehicle. Union Pacific explains that the camera records events taking place well ahead of the train, not events immediately in front of the train. (Defs.' Resp. at 16.) Jones's car may have entered the intersection after it was out of camera

11

range. Jones's arguments do not undermine the foundation laid by Pignato's affidavit and the evidence establishing the chain of custody.

### III.     Other requested relief

Jones next argues that the video should be barred as a discovery sanction under Fed. R. Civ. P. 37(c) because of Union Pacific's alleged spoliation of evidence. (Pl.'s Mem. at 20-21.) Factors to consider in deciding whether sanctions are appropriate under Rule 37(c) include whether (1) the party had a duty to preserve the evidence, (2) that duty was breached, (3) the breach exhibited willfulness, bad faith, or fault, (4) the nonmoving party was prejudiced, and (5) a sanction would alleviate that prejudice. *MacNeil Automotive Prods., Ltd. v. Cannon Automotive Ltd.*, 715 F. Supp. 2d 786, 800 (N.D. Ill. 2010). In this circuit, severe sanctions are reserved for situations when a party intentionally destroys evidence in bad faith. *See Bracey v. Grondin*, 712 F.3d 1012, 1019 (7th Cir. 2013) (affirming denial of request for adverse inference instruction when there was no evidence prison officials had destroyed videotapes for purposes of hiding adverse information).

Jones has not established that there was an obligation to preserve the hard drive, as opposed to the video itself. Under Rule 1001(d), the output of electronically stored information is an original, and Union Pacific has presented evidence that it preserved and produced that. Jones has not shown that Union Pacific acted in bad faith. The evidence before this court shows that the reuse of the hard drive after the data relating to the incident has been preserved was a routine practice for Union Pacific. "Absent exceptional circumstances, a court may not impose sanctions under these rules on a party for filing to provide electronically stored information lost as a result of routine, good faith operation of an electronic information system." Fed. R. Civ. P. 37(e). Moreover, because Jones has

not shown any basis to believe that the video file inaccurately portrays the hard drive data – other than her belief that the video should show something different – she cannot show that she has been prejudiced by Union Pacific's actions. The fact that Jones would have liked to examine the hard drive does not mean demonstrate that the video is inaccurate, inauthentic or inadmissible. *See United States v. Ladoucer*, 573 F.3d 628, 637 (8th Cir. 2009) (affirming decision not to provide an expert witness to examine a videotape to ensure it had not been altered).

Notably, Jones supports her claim that the hard drive should have been preserved by inaccurately representing the testimony of a Union Pacific witness. Jones argues that "to determine the validity of the video is that [sic], '[y]ou'd want to be able to look at the hard drive[.]'" (Pl.'s Mem. at 5, purportedly quoting Dep. Rodell Notbohm, Ex. E at 48.) In fact, Mr. Notbohm does not so testify. Jones's counsel asked the question, "So the only way to determine whether or not a video clip is actually real is to be able to compare it to the hard drive?" Mr. Notbohm did not agree; rather, he asked for clarification: "Say it again. Compare it to the hard drive as in be able to determine what from the hard drive? You'd want to be able to look at the hard drive?" Jones's counsel asked the question again:

> Q. You would have to be able to determine from the hard drive whether this video clip actually came from this hard drive?
>
> A. I think in general you are referring to chain of custody, which I think I can't cover chain of custody on this clip.

There is no basis in the record for a claim that the hard drive is critical to determining the authenticity of the video.

Finally, Jones asks that, as alternative relief, this court enter an order instructing that "the question of authenticity and the weight of the subject video is submitted to the jury as a question of fact." (Pl.'s Mem. at 20-23.) Jones says that this step is necessary to avoid the video being treated as "absolute truth" in an "anticipated motion for summary judgment." (Pl.'s Reply at 14.) The question of whether the proponent of a piece of evidence has laid a sufficient foundation, however, is for the judge to decide, not the jury, because it relates to the video's admissibility. *See United States v. Stotts*, 323 F.3d 520, 521 (7th Cir. 2003). In regard to the weight of the video, the Federal Rules of Evidence establish the role of the judge and jury. Any decision regarding summary judgment and instructions to the jury are reserved for the District Judge.

## Conclusion

For the reasons stated above, Jones's motion to bar the video evidence recorded from the locomotive at the time of the accident is denied.

_____
Geraldine Soat Brown
United States Magistrate Judge

**DATE:** January 6, 2014