**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |  |
|---|---|---|---|
| CHRISTINE M. JONES, individually and as SPECIAL ADMINISTRATOR OF THE ESTATE OF TIMOTHY JONES, | ) ) ) ) | | |
| Plaintiff, | ) ) | | |
| v. | ) ) | Case No. 12 C 771 | |
| UNION PACIFIC RAILROAD COMPANY and STEVEN PIGNATO, | ) ) ) | Judge Joan H. Lefkow | |
| Defendants. | ) ) | | |

## OPINION AND ORDER

Christine M. Jones ("plaintiff") filed suit on behalf of herself and as special administrator

of her husband's estate against Union Pacific Railroad Company ("Union Pacific") and Steven

Pignato, a locomotive engineer, in Illinois state court on January 3, 2012. (Dkt. 2.) Defendants

removed the action to this court on the basis of diversity jurisdiction. (Dkt. 1.) The case arises

from the death of plaintiff's husband, Timothy Jones ("Jones"), who was killed when his car

collided with a train owned by Union Pacific and operated at the time of the accident by Pignato.

Plaintiff brings claims for negligence, wrongful death, and loss of consortium against Pignato;

she brings the same claims against Union Pacific and seeks to hold Union Pacific liable for

Pignato's conduct under the doctrine of *respondeat superior*. (*See* dkt. 2.) Defendants have

moved for summary judgment. (Dkt. 131.) For the reasons stated below, defendants' motion is

denied.[1]

---

[1] The court has jurisdiction under 28 U.S.C. § 1332(a). Venue is appropriate in this district under 28 U.S.C. § 1391(b).

## I.    Union Pacific's Operations

Union Pacific is a Delaware corporation primarily engaged in the business of interstate freight transportation.  (Dkt 132 ("Defs.' L.R. 56.1") ¶ 1.)  In Illinois, Union Pacific operates commuter trains under the service mark "Metra" through an agreement with the Northeast Illinois Regional Commuter Railroad Corporation.  (*Id.* ¶ 5.)  It maintains north, west, and northwest lines, and trains on each line typically consist of one locomotive and commuter cars.  (*Id.* ¶¶ 5–6.)  The trains carry passengers between Chicago and its suburbs.  (*Id.* ¶ 7.)

## II.    The Railroad Crossing

Union Pacific's northwest line runs between Chicago and Harvard, Illinois and crosses over River Road in Des Plaines, Illinois.  (*Id.* ¶ 8.)  The intersection between River Road and the northwest line forms a railroad crossing, which is protected by a warning system consisting of lights, cantilevers, gates, and bells.  (*Id.* ¶¶ 9, 14.)  The warning system is designed to activate when a train approaches from either direction; it also contains a data recorder, which collects information about the system's operation.  (*Id.* ¶¶ 15, 62.)  In addition, the crossing is designated as a "quiet zone."  (*Id.* ¶ 16.)  Thus, an engineer may not sound the horn at the crossing, except when necessary to provide warning in an emergency, when warning devices are malfunctioning or out of service, or when the quiet zone is not in effect during specified hours.  (*Id.* ¶ 17.)

---

[2] Unless otherwise noted, the facts in this section are taken from the parties' Local Rule 56.1 statements and are construed in the light most favorable to plaintiff.  The court will address many but not all of the factual allegations in the parties' submissions, as the court is "not bound to discuss in detail every single factual allegation put forth at the summary judgment stage." *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (citation omitted).  In accordance with its regular practice, the court has considered the parties' objections to the statements of fact and includes in this background only those portions of the statements and responses that are appropriately supported and relevant to the resolution of this motion.  Any facts that are not controverted as required by Rule 56.1 are deemed admitted.

River Road intersects Miner Street northeast of the crossing. (*See id.* ¶ 18.) Traffic at that intersection is controlled by signals, which contain no-left-turn lights. (*Id.* ¶¶ 18, 20.) When illuminated, the lights prohibit motorists traveling west on Miner Street from turning left onto River Road and heading southbound through the crossing. (*Id.* ¶ 20.) The traffic signals are synced with the crossing's warning system,[3] meaning that when a train is approaching, cars on Miner Street receive a green light to drive straight ahead, while the no-left-turn lights are illuminated to prevent cars from entering the crossing. (*Id.* ¶¶ 21–22.)

## III.    The Accident

On the overcast and drizzly morning of August 4, 2010, a train operated by Pignato departed Ogilvie Station in Chicago and headed west for the suburbs on the northwest line. (*Id.* ¶¶ 25–27.) The train was equipped with a video system, which recorded both the front and rear views of the locomotive. (*Id.* ¶¶ 34–35; dkt. 140-6 Exh. F.) The train also contained an event recorder, which recorded and monitored data about the locomotive including its speed and whether the brakes were applied. (Defs.' L.R. 56.1 ¶¶ 32–33.)

Jones was traveling west on Miner Street from his home to a work meeting and pulled into the left-turn lane at the River Road intersection, preparing to turn southbound onto River Road. (*Id.* ¶¶ 37–38.) Although the no-left-turn lights were illuminated, Jones disobeyed the light, made a left turn, and proceeded into the crossing in front of the westbound, oncoming train. (*Id.* ¶¶ 46–48.) The train struck the driver's side of Jones's vehicle, resulting in Jones's death. At no point before the accident did Pignato sound the locomotive's horn. (Dkt. 159 ("Pl.'s L.R. 56.1") ¶ 70.)

---

[3] While plaintiff disputes that the warning system worked as intended at the time of the accident, she does not dispute that the traffic signals are synced with the warning system as a general matter.

## IV.   Eyewitness Testimony and Other Evidence

The parties dispute what happened in the moments leading up to the accident.

Defendants rely on the testimony of Pignato, as well as eyewitnesses Signe Hovde and Matthew

Stumpf, for the proposition that the warning system's gates were down when Jones entered the

crossing.  Indeed, Pignato testified that he first noticed that the gates were down when he turned

on the locomotive's bell at the whistle post.  (Dkt. 133-6 ("Pignato Dep.") at 75: 13–14.)

According to Pignato, he did not see Jones's vehicle until just before impact and applied the

emergency brake as soon as he saw the car.  (*Id.* at 62: 2–9, 69: 4–7, 70: 2.)  Hovde was standing

on the platform at the Des Plaines Metra station waiting for her train to arrive when she saw the

gates in the down position.  (Dkt. 133-8 ("Hovde Dep.") at 19: 20.)  She testified that she

observed Jones's vehicle approach the gate and hesitate briefly before pulling onto the tracks.

(*Id.* at 19: 24–20: 2.)  According to Hovde, Jones was on the tracks for five to ten seconds before

impact.  (*Id.* at 50: 3–4.)  Stumpf testified that while driving eastbound on Miner Street on his

way to work, he saw the south gate (on the other side of the crossing) coming down as the train

approached.  (Dkt. 133-7 at 27: 22–28: 15.)  He could not be sure, however, as to whether the

south gate had been all the way down before the accident occurred.  (*Id.* at 29: 24.)

In addition to eyewitness testimony, defendants support their position with the video

recorded from the locomotive, as well as the data taken from the event recorder contained in the

crossing's warning system.  Although the parties do not dispute that the video shows at least one

of the crossing gates down and the lights flashing before the accident (Defs.' L.R. 56.1 ¶ 57),

plaintiff claims that the video has been altered, largely because Jones's vehicle is not visible in

the video either before or after impact.  (*See* dkts. 29, 30.)  Plaintiff also questions the

authenticity of the video because of the existence of multiple versions.  Specifically, after Union

Pacific produced a thirty-minute video during discovery, plaintiff's counsel realized that one of

defendants' expert witnesses had reviewed a fifteen-minute video in preparing his report. (*See*

dkt. 143 at 7.) While defendants maintain that the fifteen-minute video is merely a shorter

version of the thirty-minute video (*see* dkt. 151 at 1–2), plaintiff asserts that the existence of two

videos supports her claim that the video evidence has been altered. (Dkt. 143 at 8.) Similarly,

plaintiff challenges the authenticity of the data taken from the warning system's event recorder,

which indicates that the warning system's gate arms, lights, and bells were fully activated at the

time of the accident and that the gates were down in the horizontal position for at least twenty-

five seconds before the train entered the crossing. (Defs.' L.R. 56.1 ¶ 64.) According to

plaintiff, the data log produced by defendants is missing sixty-two train crossings between

August 2 and August 3, 2010 (Pl.'s L.R. 56.1 ¶ 10), suggesting that defendants tampered with

the data.

Plaintiff relies primarily on the testimony of eyewitness Hank Kolak to support her claim

that the gates were not down before the accident occurred. While driving westbound on Miner

Street on his way to work, Kolak pulled into the left-turn lane directly behind Jones's vehicle at

the intersection of Miner Street and River Road. (Dkt. 133-5 ("Kolak Dep.") at 23: 2–5.) He

watched Jones turn left against the light and thought that Jones would merely pull up to the

crossing gate and wait for the train to pass. (*Id.* at 36: 7–13.) Jones, however, proceeded to enter

the crossing; once Jones's vehicle was halfway through the crossing, Kolak said to himself,

"[H]oly shit, the gates didn't come down."[4] (*Id.* at 32: 12–14.) Kolak remembered seeing "the

crossing gate come down against the silhouette of the train" before the locomotive hit Jones's

---

[4] Although defendants object to this statement as hearsay, it falls under the hearsay exception for
present sense impressions under Federal Rule of Evidence 803(1) as the statement describes an event
"without calculated narration," Kolak personally perceived the event, and the statement was made while
the event was unfolding. *See Schindler* v. *Seiler*, 474 F.3d 1008, 1011 (7th Cir. 2007) (internal quotation
marks omitted).

vehicle.  (*Id.* at 32: 21–22.)  Although Kolak could not recall whether the bells or warning lights had been working, he was sure that the gates were not down when the collision occurred.  (*Id.* at 75: 9–17.)

## V.      Expert Testimony

As discussed in more detail in the court's concurrently entered opinion and order resolving the parties' *Daubert* motions, each side retained expert witnesses to testify at trial. Defendants' experts focused on reconstructing the accident, interpreting the data from the event recorders, and authenticating the locomotive video.  Michael Rogers, a mechanical engineer, reconstructed the accident to explain why Jones's vehicle is not visible in the video (*see* dkt. 133-1 at 1), and Foster Petersen, also a mechanical engineer, analyzed the data from the train's event recorder.  (Dkt. 133-2 at 1, 5.)  Petersen concluded, among other things, that the train had been traveling at forty-six miles per hour immediately prior to the collision, which was in compliance with the Union Pacific Harvard Subdivision Timetable speed limit of fifty miles per hour, and the maximum authorized passenger train speed on a class 3 track of sixty miles per hour under 49 C.F.R. § 213.9.  (*Id.* at 5.)  Peterson also confirmed that Pignato did not activate the locomotive horn prior to the accident.  (*Id.* at 7.)  Richard Campbell, an expert with experience in railroad and traffic signal design and operation, reviewed the data from the warning system and opined that the "traffic control system was functioning properly" at the time of the accident.  (Dkt. 133-3 at 8, 11–12.)  Bruce Koenig, defendants' expert in forensic video and audio analysis, opined that the locomotive video "is an original, executable video/audio recording."  (*See* dkt. 151-1 at 3.)

Plaintiff's experts devoted their attention to similar subjects.  The two reports filed by Paul Byrnes, an attorney and former locomotive engineer, considered whether Union Pacific's

actions were the cause, in whole or in part, of the accident, and whether Union Pacific properly preserved the locomotive video recording. (Dkt. 136-2 Exh. B at 2; dkt. 136-3 Exh. C at 2.) Although the court found many of his opinions inadmissible, Byrnes's remaining opinions pertain to the reasonableness of Pignato's conduct, assuming, based on Kolak's testimony, that the gates were up as the train approached the crossing. (*See* dkt. 136-2 Exh. B ¶¶ 19, 20.) For example, he opined that if Piganto could not be absolutely certain that the gates were fully down, "he should have approached the crossing prepared to stop short of it until it could be determined that the devices were fully activated." (*Id.* ¶ 19.) James Loumiet, a mechanical engineer and accident reconstructionist, interpreted the train's event recorder data and opined that Jones's vehicle should have appeared in the locomotive video, again assuming the truth of eyewitness accounts. (*See* dkt. 138-2 Exh. B at 2 ¶¶ 1–6, 3 ¶ 7.) Plaintiff also retained Edward Primeau, a purported expert in forensic video analysis, to opine that the video recording had been altered, but the court found him unqualified to testify.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). To determine whether any genuine fact issue exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c). In doing so, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott* v. *Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). The court may not weigh conflicting evidence or

make credibility determinations.  *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704

(7th Cir. 2011).

The party seeking summary judgment bears the initial burden of proving there is no

genuine issue of material fact.  *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91

L. Ed. 2d 265 (1986).  In response, the non-moving party cannot rest on bare pleadings alone but

must designate specific material facts showing that there is a genuine issue for trial.  *Id.* at 324;

*Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000).  If a claim or defense is factually

unsupported, it should be disposed of on summary judgment.  *Celotex*, 477 U.S. at 323–24.

## ANALYSIS

Plaintiff alleges that Union Pacific acted negligently when it failed to inspect and

maintain the warning system; failed to ensure that the warning system would give at least twenty

seconds of warning time and that the gate arms would be down in the horizontal position for at

least five seconds before the train reached the crossing;[5] failed to ensure that the warning system

would give passenger vehicles adequate time to clear the intersection; and failed to ensure that

the warning system would remain in "the fail safe position" if it stopped working.[6]  (*See* dkt. 2

¶ 18.)  As for Pignato, plaintiff claims that he was negligent because, among other things, he

failed to keep a proper lookout, failed to engage the horn, and failed to use the emergency brake

when the gates did not activate.  (*See id.* ¶ 57.)

To prevail on these claims under Illinois law, plaintiff must establish "the existence of a

---

[5] Although not specified by plaintiff, these timing requirements are drawn from 49 C.F.R.
§§ 234.223 and 234.225.  Indeed, under Illinois law, a plaintiff may recover "for negligence resulting
from violation of federal railroad safety regulations" and "the violation of a safety regulation intended for
the protection of the class of persons to whom the plaintiff belongs . . . [constitutes] prima facie evidence
of negligence."  *Nunez* v. *BNSF Ry. Co.*, 730 F.3d 681, 682 (7th Cir. 2013) (citations omitted).

[6] Although plaintiff's complaint also alleges that Union Pacific negligently designed the warning
system, she abandons this claim in her opening brief.  (*See* dkt. 158 at 13 n.4.)

duty of care owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach." *Buechel* v. *United States*, 746 F.3d 753, 763–64 (7th Cir. 2014) (citing *Thompson* v. *Gordon*, 948 N.E.2d 39, 45, 241 Ill. 2d 428, 349 Ill. Dec. 936 (2011)). Defendants argue that summary judgment should be granted in their favor because (1) Jones's actions were the sole proximate cause of the accident and his death; (2) the crossing system operated as intended and provided sufficient warning time; (3) defendants had no duty to warn of the open and obvious danger of the oncoming train; and (4) Pignato operated the locomotive in accordance with the law and Union Pacific's rules.

## I. Proximate Cause

Defendants first argue that the sole proximate cause of the accident and Jones's death was Jones's failure to obey the no-left-turn lights, as well as his decision to disregard the warning system and to drive in front of the oncoming train. Plaintiff acknowledges that a jury would need to allocate a percentage of fault to Jones under Illinois's comparative negligence rules, *see Spinozzi* v. *ITT Sheraton Corp.*, 174 F.3d 842, 847 (7th Cir. 1999), but argues that the relative fault of the parties is a question for the trier of fact. The court agrees.

Proximate cause encompasses both cause in fact and legal causation. *See Fitzgibbon* v. *Nat'l Broad. Co.*, 732 N.E.2d 64, 65, 314 Ill. App. 3d 52, 247 Ill. Dec. 348 (2000) (citations omitted). To establish the former, a plaintiff must show that the defendant's "conduct was a material element and a substantial factor in bringing about the injury." *Lee* v. *Chi. Transit Auth.*, 605 N.E.2d 493, 502, 152 Ill. 2d 432, 178 Ill. Dec. 699 (1992) (citation omitted). Legal causation, however, "'is essentially a question of foreseeability,'" *id.* at 503 (citation omitted), and the inquiry is whether the harm suffered "is of a type that a reasonable person would see as a likely result of his or her conduct." *First Springfield Bank & Trust* v. *Galman*, 720 N.E.2d 1068,

9

1072, 188 Ill. 2d 252, 242 Ill. Dec. 113 (1999) (citation omitted).  On the whole, "proximate

cause is a question for the trier of fact, but [it] may be found as a matter of law when the facts are

not only undisputed but are also such that there can be no difference in the judgment of

reasonable men as to the inferences to be drawn from them."  *Blood* v. *VH-1 Music First*, 668

F.3d 543, 546 (7th Cir. 2012) (citations omitted) (internal quotation marks omitted).

Here, the disputed facts in the record counsel against a finding of proximate cause as a

matter of law.  As noted above, the parties dispute whether the gates were down at the time of

the accident.  While defendants point to the testimony of Pignato, Hovde, and Stumpf, as well as

the video recording and the data contained in the warning system, Kolak testified that the gates

were up at the time of impact.  If Kolak is believed, a reasonable jury could find that Union

Pacific's failure to have a properly working warning system was a substantial factor in causing

the accident and that Jones's death was a foreseeable result of Union Pacific's conduct.

Similarly, with respect to Pignato, a jury could find that Pignato should have sounded the horn or

attempted to stop the train if the gates were up, and that such actions on his part would have

prevented the accident.  Moreover, even if a jury concluded that the gates were down when Jones

entered the crossing, Hovde testified that Jones's vehicle was in the crossing for five to ten

seconds before impact, arguably giving Pignato enough time to sound the horn and avoid the

collision.  These genuine issues of material fact make this case readily distinguishable from those

on which defendants rely.  *Cf. Nunez* v. *BNSF Ry. Co.*, 936 F. Supp. 2d 969, 980 (C.D. Ill. 2012)

(finding the plaintiff's proximate cause argument insufficient when she failed to introduce

evidence suggesting that the warning system did not provide the requisite warning to the

decedent and conceded that the decedent had adequate time after the warning system activated to

escape the crossing and reach safety); *Sheahan* v. *Ne. Ill. Reg'l Commuter R.R. Corp.*, 571

10

N.E.2d 796, 799, 212 Ill. App. 3d 732, 15 Ill. Dec. 816 (1991) (finding that the plaintiff's

decision to disregard the warning system at the crossing was the proximate cause of the accident

when it was undisputed that the warning system had been working as intended).  As such,

proximate cause must be left to the jury.

## II.     The Operation of the Warning System

Defendants next argue that there is no triable issue of fact with respect to whether the

warning system operated as intended because the video recording, the data from the warning

system, and the testimony of Pignato and Hovde establish that the gates were down before the

collision occurred.  While it is unclear whether plaintiff intends to rely on the common law, a

statute, an ordinance, or federal regulations as the source of Union Pacific's duty with respect to

the warning system, it is undisputed that, at a minimum, Union Pacific had a duty "'to provide

adequate warning to travelers that a train is approaching.'"  *Chiriboga* v. *Nat'l R.R. Passenger*

*Corp.*, 687 F. Supp. 2d 764, 768 (N.D. Ill. 2009) (quoting *Magna Bank of McLean Cnty.* v.

*Ogilvie*, 601 N.E.2d 1091, 1095, 235 Ill. App. 3d 318, 176 Ill. Dec. 393 (1992)); *see also*

*Sheahan*, 571 N.E.2d at 798.

In this case, there is a genuine issue of material fact as to whether Union Pacific breached

that duty.  As discussed above, Kolak's testimony calls into question whether the gates were

down when Jones entered the crossing, and the parties do not dispute that Union Pacific had a

duty to ensure that this occurred.  While it is true that defendants have more evidence on their

side, summary judgment "does not denigrate the role of the jury. . . .  Credibility determinations,

the weighing of the evidence, and the drawing of legitimate inferences from those facts are jury

functions, not those of a judge."  *Anderson*, 477 U.S. at 255.  Accordingly, summary judgment

cannot be granted on this ground.

11

Defendants argue that Kolak's testimony does not create an issue of fact because he was unable to testify about the position of the gate before the accident. Therefore, defendants reason, Kolak's testimony, at most, raises an inference that the gate was up at some point prior to the collision, not that the gate was up when Jones entered the crossing. According to defendants, Kolak's testimony supports the theory that Jones's vehicle hit the gate as it entered the crossing, causing it to pop up. Thus, Kolak merely observed the gate on its way down, and his testimony does not create a triable issue.

While defendants' version of the events may serve as a viable, or even compelling, trial theory, it does not require the court to dispose of the case at this stage. Defendants are correct that Kolak testified that the first time he saw the gates descending was in the silhouette of the train and that he was not sure whether the gates were down as Jones entered the crossing. (Kolak Dep. at 32: 17–33: 10.) Nevertheless, his testimony that the gates were up when Jones neared the middle of the crossing is some evidence that the gates were also up only moments earlier when Jones entered the crossing. Taking Kolak's testimony in the light most favorable to plaintiff, as the court must, there is an issue of fact with respect to the operation of the warning system. The jury must make a determination on this issue at trial based on eyewitness testimony and other evidence.

### III.     Open and Obvious Danger

Defendants contend that they had no duty to warn Jones of the train's approach because a moving, oncoming train is an open and obvious danger. Under Illinois law, "the open and obvious doctrine is an exception to the general duty of care owed by a landowner." *Park* v. *Ne. Ill. Reg'l Commuter R.R. Corp.*, 960 N.E.2d 764, 769, 2011 IL App (1st) 101283, 355 Ill. Dec. 882 (2011) (citations omitted). "When a condition is deemed open and obvious, the likelihood

of injury is generally considered slight as it is assumed that people encountering dangerous conditions that are open and obvious will appreciate and avoid the risks." *Id.* (citation omitted). A conclusion that a condition is open and obvious operates as a finding that the defendant owed the plaintiff no duty, unless the plaintiff can show that a duty arose under one of the exceptions to the doctrine. *See McDonald* v. *Ne. Ill. Reg'l Commuter R.R. Corp.*, 988 N.E.2d 1078, 1085, 2013 IL App (1st) 102766-B, 370 Ill. Dec. 722 (2013) (citation omitted).

Here, however, the doctrine is not relevant, as it applies only to premises liability claims, which are not present in this case. *See Chu* v. *Bowers*, 656 N.E.2d 436, 440, 275 Ill. App. 3d 861, 212 Ill. Dec. 113 (1995) (citations omitted); *see also Pasarella* v. *NFI Interactive Logistics, LLC*, No. 12 C 4147, 2015 WL 4148674, at *7 n.6 (N.D. Ill. July 9, 2015) (citations omitted); *Petrouski* v. *Brandenburg Indus. Serv. Co.*, 2012 IL App (1st) 110500-U, 2012 WL 2402634, at *10 (Mar. 22, 2012) (citation omitted). Indeed, the cases involving oncoming trains on which defendants rely all took place in the premises liability context. *See Choate* v. *Ind. Harbor Belt R.R. Co.*, 980 N.E.2d 58, 68, 2012 IL 112948, 366 Ill. Dec. 258 (2012) (finding that the child-trespasser exception to the general rule that a landowner owes no duty of care to trespassers did not apply because the danger of a moving train was open and obvious); *McDonald*, 988 N.E.2d at 1086 (holding that Metra did not owe a duty to warn a passenger crossing the tracks in a pedestrian crosswalk of the danger of the oncoming train); *Park*, 960 N.E.2d at 770 (rejecting the plaintiff's argument that Metra should have warned its passengers and invitees of the danger posed by oncoming trains, and finding the danger to be open and obvious). Because the doctrine does not apply, the court will not grant summary judgment on this basis.

**IV.     Pignato's Operation of the Train**

Finally, defendants argue that they are entitled to summary judgment on plaintiff's claims

against Pignato because he operated the train in compliance with the speed limit, maintained a

proper lookout, complied with the law and Union Pacific's rules in declining to sound the horn,

and otherwise operated the train in an appropriate manner.  "A railroad has a duty to exercise due

care to avoid a collision."  *See Espinoza* v. *Elgin, Joliet & E. Ry. Co.*, 649 N.E.2d 1323, 1326,

165 Ill. 2d 107, 208 Ill. Dec. 662 (1995) (citation omitted).  Although an engineer "is not

required to anticipate and guard against the possibility that a motorist may disregard a warning

and enter a crossing, the engineer is required to stop the train when it becomes apparent that the

motorist has not heard or will not heed the signal given by the train."  *Id.* at 1326–27 (citations

omitted).

Issues of fact remain as to whether Pignato breached his duty of care.  It is undisputed

that Pignato was operating the train in accordance with the speed limit required by the Union

Pacific Timetable and the federal regulations, and that the crossing is designated as a quiet zone.

Further, Pignato testified that he saw that the gates were down at the crossing, and that he did not

see Jones's vehicle until just before impact.  (Pignato Dep. at 69: 4–7, 75: 11–14.)  According to

Pignato, he engaged the emergency brake immediately after seeing Jones's vehicle.  (*Id.* at 70:

2.)  Kolak, however, testified that the gates were not down at the time of the collision, and

Pignato acknowledged that if the gates were in fact up, he should have stopped the train.  (*See id.*

at 53: 21–54: 12.)  Further, even if the jury concludes that the gates were down, Hovde testified

that Jones was in the crossing for five to ten seconds (Hovde Dep. at 50: 3–4), calling into

question whether Pignato should have seen Jones's vehicle earlier and sounded the horn,

avoiding the accident.  (*See* Pignato Dep. at 54: 22–55: 1 ("Q: Now, if you see cars at an

activation failure crossing the intersection would you also blow your whistle?  A: Yes.").

Indeed, Pignato conceded that if cars were driving in the crossing, he should have sounded the

horn, notwithstanding the crossing's designation as a quiet zone.  (*Id.* at 55: 23–56:2.)

Given the issues of fact in the record, summary judgment cannot be granted.  Because the

court may not weigh the evidence at this stage, defendants' motion will be denied.[7]

### CONCLUSION AND ORDER

For the foregoing reasons, defendants' motion for summary judgment (dkt. 131) is

denied.  The case is set for status on Tuesday, September 29 at 11:00 AM to set a trial date.  The

parties are directed to explore potential settlement and to advise the court if referral to a

Magistrate Judge for a settlement conference would be useful.


Date:   September 8, 2015 _____
U.S. District Judge Joan H. Lefkow

---

[7] The court agrees with defendants, however, that any claim that Pignato was traveling too fast under the circumstances fails, as it is undisputed that he complied with the speed limits set by Union Pacific and the federal regulations. *See CSX Transp., Inc.* v. *Easterwood*, 507 U.S. 658, 675, 113 S. Ct. 1732, 123 L. Ed. 2d 387 (1993) (holding that speed limits imposed by federal regulations on freight and passenger trains preempted any common-law claim that the conductor, who operated the train within federal limits, was negligently proceeding too fast under the circumstances); *Waymire* v. *Norfolk & W. Ry. Co.*, 218 F.3d 773, 776 (7th Cir. 2000) (similar).